Appeal number 2012-1102, ASPEX EYEWEAR v. ALTAIR EYEWEAR Mr. Nick Odema, good morning. You may begin. Good morning, Your Honor. May it please the Court. The District Court committed reversible error by relying on its own unsupported notions of common sense to find the claim one of the 054 patent was invalid for obviousness. Only this past May, Judge Rader issued an opinion in Ritter's Court, Judge Rader writing, issued an opinion in the Dietzen-Watson case, the Mintz v. Dietzen-Watson case, saying that the mere recitation of the words common sense by a District Court judge doesn't get you there. It doesn't advance the obviousness analysis. What you need to do is to show that that common sense is well-grounded in knowledge that the skilled artisan had at the time of the invention. Because under KSR, common sense is not a layperson or the District Court's common sense. It's the skilled artisan's common sense. And in this case, the District Court knew that it needed expert testimony to decide the issue of obviousness. It knew that because of this Court's earlier decision eight years ago in the Concepts and Optics case involving another of ASPEX's magnetic clip-on eyewear patents. And the panel held in that case that this is not one of those very rare technologies that is so simple you don't need expert testimony. In this case, the level of skill in the art submitted by the parties was between three and five years in the design and development of eyewear. And under KSR and its progeny, because it's the knowledge of the person of ordinary skill that's so important, there has to be clear and convincing evidence that at the time of the invention, the skilled artisan would have, one, had a reasonable expectation that the prior elements could be physically combined the way the defendant said they could be, and two, that the combination would be successful. No evidence of that in this case, Your Honor. No analysis of the District Court on any of these issues. And what I find striking, the District Court says, well, I'm relying on my own common sense. Altair's expert is not really an expert. The District Court spent pages, pages, discrediting Mr. Sedano's testimony. He said it was unhelpful and used even less flattering terms. He said it didn't advance the ball at all. But then the District Court said, despite my serious misgivings, because Sedano's conclusion of obviousness is the same as the one I want to reach based on my own support of common sense, the patent's obvious. That's basically what he did. And we can't forget, Your Honor, that we have a re-examination here. We have a re-examination that Altair initiated so the PTO's experts could take advantage of the PTO's experts and was based on the very same prior art in the litigation. And the patent office considered Altair's anticipation and obviousness arguments. They considered them all and found it's not obvious, it's not anticipated. Now, the District Court paid lip service to the law saying, well, you know, the burden of proof is clear and convincing evidence. It's on Altair and stays on Altair forevermore. And the fact that we have a re-examination decision by the PTO on the very same prior art, the law says, this court's precedent says, I've got to give it weight, the burden becomes even heavier. But then, what did the District Court do? It didn't analyze the re-examination at all, it didn't refute it, it didn't dispute it, it didn't say where the PTO went wrong. And in addition to the PTO's experts, we have the plaintiff's experts, Mr. Zaroff, who submitted detailed testimony on how, at the time of the invention, the skilled artisan, using common sense, judgment, ordinary creativity, would not have combined the references in the way that Altair and the District Court did. And even if you did combine those references, there would still be several plain elements missing. So... Mr. Nicody and I... Yes. It seems to me that this is a fairly crowded art. It's not as sophisticated as DNA or nanotechnology or some of the other things we wrestle with. We're talking about eyeglasses and just a magnetic applied sunglass shade that would fit over the front of the eyeglasses. And in looking through these various references, one thing struck me as sort of curious, and there wasn't a lot of discussion about this, but in the earlier 207 patent, it's the earlier Chao patent. Yes, sir. There's figure 7, which shows the configuration of the magnets that are on the sides of the glasses that hold the auxiliary lens in place. The temple regions. The temple regions. And that figure is remarkably similar to figure 4 of the patent in suit. Why isn't that a clear teaching of the structural configuration that is at the center of this dispute? And why isn't that a proper basis to conclude that just instead of having two of these assemblies at the temples of the glasses, you could put one in the middle? Because they're very different. Now, Mr. Chao, in the 207 patent, his vision was to have stable support of the auxiliary on the primary. I need to have these magnetic members separated at opposite ends, and I need arms on the auxiliary frame going over and on top. Okay? So there are all of these additional structural features that they need. And one thing that Chao said that was very important is, do not embed magnets. Magnets compromises the structural integrity of the frame. Do not embed magnets. Now, one of the claim elements in 054 claim 1— But, of course, in that earlier 207 reference, there was a different kind of a frame, and you could sort of understand it was a fairly thin frame. You could understand why you wouldn't want to be embedding things in the frame that might cause some weakness. But the structure of the magnets are embedded in the arms that are positioned at the temples. No, actually, not, Your Honor. See, the way— Isn't that what figure 7 shows? No, it's actually showing something called a projection. Now, if you look at Chao 207— The projection is different from an arm? No, no. One of the advances in the Chao 207 to overcome the problem of embedding magnets was you put the magnetic member in a separate projection, a cylinder. And what Chao did was he welded those to the temple regions. He didn't want them embedded in the frame itself because that would compromise the structural integrity of the frame. Now, in the revolution case that was before this court in 2009, on the reissued version of that Chao 207 patent, the court recognized a different panel, but the court recognized that that was one of the problems that Chao 207 wanted to avoid—embedding magnets in the metal. So what he did was he put it in a separate projection and he welded those to the temple regions. And that's what those figures are showing. Now, in the 054 patent, to get rid of—to facilitate what the primary object of the invention as stated in the specification, easy one-handed attachment— Before you go to there— Yes, sir. When I look at the claim of the 054 patent, it discloses the middle bridge portion of the said primary spectacle frame. And I look at the different figures. One of the most prominent differences between the 054 patent and some of the prior art is the middle portion or the bridge, and that's where the magnets are now located. But when you go to Xen, Xen discloses primary frames and it's got a bridge, an extended bridge, that goes over and catches the bridge in the primary lens. I mean, it just doesn't seem that—it does seem it would be common sense, and it would be reasonably grounded to see the connection or the disclosure moving from the magnets on the temples onto the middle portion of the bridge. Well, let's look at Xen, Your Honor. In Xen, the magnets are located on the lens rims. That part that you mentioned that overhangs the primary frame, there's no magnets in there at all. No, but that is prominent in Xen. You do have—what do they call it? They call it a backward-pointing protrusion on the bridge of the auxiliary frame. It's inserted into a recess of the bridge of the primary frame. That's correct. The 054 patent has almost the same type of configuration, except that that's where the magnets are located. And nowhere else. See, Xen, as our expert has testified, Xen obviously didn't want the magnetic engagement to be above the bridge. He obviously didn't think that that was stable. So what he does—he must have a cluster of eight magnets on one lens rim and eight magnets on another lens rim. Now, here's an important point. Xen, considered by itself, may not render the 054 patent obvious, but when you consider Xen in view of the other prior art, why wouldn't that not render it obvious? One reason is because, as was argued to the patent office, and as our expert has testified, Xen is a front-mounting design. Now, let's go to the original prosecution of the 054 patent, and I can find the A page for you. And in the original prosecution, the primary reference was Sadler's, which was another front-mounting design where the magnets were on the front, and they hooked on on the front. And at Appendix A-535 to 536, listen to what the attorney said about Sadler's. He says, Note that Sadler's magnets on the primary frame are attached frontally to the magnets on the utility frame, as shown in Figure 2 and Figure 3 in Sadler's patent. In other words, the magnetic engagement for the frames in Sadler is not done above the bridge, but in front of the bridge. Now, the Chapter 07 patent says that when you do things in the horizontal plane, in the front and the back, gravity is working against you. It's pulling down on the connection. And the attorney goes on to say that in the 054, when you have the top down on the bridge and nothing else, gravity works for you. Now, you have all of these references that have hooks and pins and things all over the place. And where was the clear and convincing evidence of the skilled artisan that 15 years ago, when the invention of the 054 was conceived, that they would have sat in a room and taken all of these things with divergent teachings and contradictory teachings and come up with the elegant solution of plane 1 of the 054? There's no evidence of that. Let me read you something that the district court said. Why is this anything more than just a matter of design choice,  and the multiplicity of teachings? Because which teachings do you choose and which ones do you disregard? That's in the domain of the skilled artisan. It's not just a question of, with all due respect, what Your Honor is suggesting is exactly what the Minsk court said you shouldn't do. When you look at a patent, you look at the problem and you see the solution in the same patent. The natural inclination is to say it's self-evident. But that's not the test. That the impermissible use of hindsight, and as Judge Rader noted in the Minsk case, when the inventions appear to be not that complex, that's when you really have to worry about using hindsight. And the district court had to engage in a sort of amnesia. Judge Rader said, and take yourself back in time to the conception of the invention and ask yourself, what did the ordinarily skilled artisan know? And what would he do? Can you address real quickly the one-handed limitation? Absolutely. It seems to me that, if anything, that could be your strongest argument. The one-handed limitation, the district court and the patent office found that none of the prior art teaches to just disclose it at all. Now, Altair has argued, for the first time, that it's not a claim limitation. Well, it is a claim limitation for several reasons. One, the patent office found it was. Two, the examining attorney argued that limitation over the prior art. Three, Altair and the examining attorney... When I look at the specification, I just don't see anything that discloses that type of structure. I'll show you exactly where it is. Now, if we look at the 054 patent, now, there's a case that came out in 2005, this court, HOEFFER 2005. And that case says, and what Altair's basically saying is, you have this limitation at the end for allowing, and I'm paraphrasing, one-handed attachment. And that's not a claim limitation, it's just an intended result. Not so. Because what HOEFFER says is, when a patent makes clear that it's an integral part of the invention, it's a limitation. Now, let's look at A76, column one, right under the summary of the invention, the very first sentence. The primary objective of the present invention is to provide auxiliary lenses which may be easily engaged on the primary spectral frame. Then it goes on. It describes some of the features, and then it says these features for allowing the auxiliary spectral frame to be attached to the primary spectral frame with only one hand by the user. That's the first time it says it. What structure accomplishes that result? The structure with the magnetic members on the top of the bridge, in the primary frame, and the structure with the magnetic members on the projection of the clip-on, we just have to go, boop, and it's on. Is it just the magnet? I mean, the claim doesn't describe, for example, the fact that this piece 22 in figure two has a longitudinal dimension that you can envision would allow the auxiliary lens to sort of sit on the primary lens and sit there in a stable fashion. The claim doesn't talk about that. Let's look at this. Well, I think you have to read the claim language and then look at what the inventor's attorney said during prosecution in distinguishing the prior author. That's very important. If we look at the claim language, the last element says a second magnetic member secured to said projection, that's projection off the auxiliary frame bridge, for engaging with said first magnetic member of said primary spectacle frame and for allowing, etc., etc. It's that structure, and if we look in the patent, it's basically the structures shown in figures one, two, and three. It's that elegant structure that the prior art did not have and the prior art did not think would accomplish that result. Are you saying that claim one is limited to the structure shown in figure two? No. I'm not saying that at all, but I'm saying when you look at the prior art, you look at what the patent attorney argued during prosecution. He said one of the important things with this invention, which the prior did not have, was the magnetic engagement above the bridge where gravity works for you. Without all these other requirements, the hooks and pins and arms and all these other things, it's easy to put it on with one hand without all these other extraneous elements. All right. Thank you. We've consumed your rebuttal time, but we'll restore three minutes and we'll give the other side an additional three minutes as well. Thank you. Good morning. Good morning. How are you? Very well, thank you, Your Honor. You may proceed. Thank you. May it please the Court, this case presents a textbook example of a patent that is invalid under KSR. It's a very simple patent in the mechanical art. It does not have a lot of technical specifications or requirements. It speaks in terms solely of very simply stated structural elements, glasses, frames, magnets in a projection and on a bridge with no further description or limitation as to what those elements have to include or comprise in order to achieve the claimed purpose. There's no dispute that each of those elements was known in the prior art. There's also no dispute that each of those elements as recited in Claim 1 performs precisely as is expected to perform. The magnets stick together. The frames sit on your face. The bridge bridges your nose. The projection from the auxiliary frame goes over the primary frame. Well, the other side's expert, Mr. Zaro, had a lot to say and Judge Young didn't really talk about that. Isn't that a problem for you? I don't believe it is, Your Honor. Mr. Zaro used a lot of words, but he didn't actually say very much. Focusing on one of the issues that the plaintiff has called out, which is Mr. Zaro's assessment of secondary considerations, that's something that I've actually never even briefed below. Mentioned it in, I think, one sentence in passing at oral argument. It was we, the accused infringer, who made the point that there's no evidence of secondary considerations of non-obviousness. But, Mr. Zaro, I did talk about if you take all of these references, you can take bits and pieces here, there, and everywhere and come up with sort of a mongrel device. But that's not the right way to do it and that doesn't add up to obviousness. What Mr. Zaro actually said, Your Honor, is he insisted that in doing an obviousness analysis, you had to take all of the features of each prior art reference and smash them all together so that if you're combining Miki, which has a bridge mounted projection and two hooks, and you combine it with another patent that also has hooks, you wind up with a piece of eyewear that's just bristling with hooks and projections all over the place. He refused to acknowledge that a person of ordinary skill in the art can combine different teachings from different prior art references to achieve a particular purpose. But that's exactly what KSR says the analysis should be, that a skilled artisan is going to be capable of assembling teachings from various prior art, like assembling pieces of a puzzle. Mr. Zaro never understood that. But what are we to make of the fact that Judge Young didn't make that point, didn't discuss the expert's testimony and didn't explain why the expert's testimony really shouldn't matter. He just seemed to ignore it. He did, Your Honor, he didn't ignore it. He said that he considered the evidence, for example, of secondary considerations and rejected it. On the obviousness, you're right. He did not specifically say, here's what Mr. Zaro said and here's why I disagree with it. But I don't know that he was required to do that. This was a case-stated proceeding. It's the equivalent of a bench trial. But in this context, it's not unlike Judge Young sitting in the position of a jury. He found obviousness. He stated the basis for his finding, which is that he thought that the elements were known and this was a matter of obvious design choice as to where to put the magnets. He sure didn't like your expert. I'm sorry, Your Honor? He sure didn't like your expert. He was critical of both sides' experts, frankly. He had some unkind things to say about Mr. Zaro as well. But to the Court's credit, he does, and he said this in his opinion, he takes his role as gatekeeper very seriously. He assumed in this case, we believe unnecessarily, that he needed to consider expert testimony. And I think part of what he was struggling with was what is there for an expert to say? It's true that both experts, to a large extent, said the 054 patent claims this and the prior art or the accused device has that. Because of the simplicity of the claim language, there's not a whole lot more to say about it. And I think that Judge Young was struggling to find the kind of technical analysis that you often see in a more complicated patent case because he was assuming he needed to be guided by expert testimony. There, I think he could have freed himself from that a little bit, as this Court has held in Myers v. Masterlock and Perfect Web. He was well within his right to say, I don't need expert testimony for this. The claimed invention is well within the grasp of the layperson. So he was critical of both experts, but he did, in the end, credit, and he recited parts where our expert did an analysis that's not unlike what the expert did in the Myers v. Bowdoin case that this Court just decided a few weeks ago. That was another case involving simple technology, a method of frothing milk using a plunger. And because the technology was so simple, all the expert really did there was compare the claims to the accused device and give a little bit of example to the prior art and give a little bit of discussion as to why people of ordinary skill in the art would have combined them. What the expert did in that case... How do you respond to your opponent's argument that the specification discloses sufficient structure to support a one-handed claimed notation? We don't agree with that for a couple of reasons, Your Honor. First, with respect to Mr. Nicodema, he's wrong that we did not argue in the reexamination that the one-handed assembly language is a statement of intended use. We did. And I can provide sites to where we did so, Your Honor. Just by way of example... Appendix 1454 to 1555, arguing that one-handedness was merely a statement of intended use in the context of arguing that Nici doesn't anticipate. Similarly, 1462, making the same intended use argument for STEMI. And in fact, Your Honor, when the PTO granted reexam and issued its office action in March of 2010, it accepted those findings and rejected the claims of the 054 patent as being invalid in part on grounds of anticipation in view of Nici and STEMI and specifically describing one-handedness as a statement of intended use. In ultimately deciding to reissue the patent, the PTO did an about-face on that without ever explaining why. But it's not true that we didn't raise it below. And we certainly raised it before the district court. So our view first is one-handedness is a mere statement of intended use. It's not tied to any particular structure. It's not in sufficiently definite functional language to be considered a functional limitation of the claim. And once you take it, if you treat it as a statement of intended use, the prior art clearly has all the same structure as the claim of the 054 patent. And so under cases like in Ray Schreiber, it should have been incumbent on aspects to prove that the prior art is not capable. Do you have any case that holds that some statement in the body of a claim is nothing more than a statement of intended use? We do, Your Honor. We have lots of cases where these statements are in the preamble. We do, Your Honor. This court, more than 25 years ago, in In Ray Stenzel, S-T-E-N-C-E-L, 828 Fed Second, 751. 828 Fed Second, what? Yes, 828 Fed Second, 751. In Ray Stenzel, S-T-E-N-C-E-L, from 1987. This court recognized that statements of intended use often, that this is a direct quote, often but not necessarily appear in the preamble. It depends on the facts of the case. You have to look at what the actual language in question is doing. And in that case, the court was considering a particular limitation that was in the language of a particular claim. In that case, the court did find that the language in question was a limitation. But it certainly recognized that statements of intended use can be found in the body of a claim. And in fact, Your Honor, the Board of Patent Appeals regularly does find statements of intended use in the body of patent claims, including, for example, earlier this year, in ex parte, Ta-Yong Yun, Y-O-O-N, from March of 2012. I have a Westlaw site for it, Your Honor, which is 2012 Westlaw, 759-838. And in that case, the Board of Patent Appeals did find claim language, not preamble language, but claim language, would be in their statement of intended use. So that's not a distinguishing fact, Your Honor. This court has considered when things are statements of intended use versus when they are claim limitations. And we cited, for example, in our brief, the Catalina v. Kool Savings case. It's a limitation if it recites essential structure. One-handed assembly does not do that here. It's a limitation if it recites something that's necessary to give life, meaning, or vitality to the claim. Here, the claim is either. It is what it is. And there's nothing about that statement of intended use that adds anything to what the structure itself does. But isn't it, in a sense, a statement of a definition of the structure? Because, after all, the claim calls for a structure that accomplishes that purpose. If, Your Honor, we think it's more along the lines of extolling the benefits or features of the structure, which is a statement of intended use. If what the plaintiff intended to do actually was that sort of functional language, there are some additional problems that go along with that. The Court has recognized that patentees are certainly free to claim elements in functional language, but there are risks that are associated with that. One of them being, are you reciting functionality in a way that's sufficiently objective and definite that a person of ordinary skill in the art will know the limitations of the claim? And here we've pointed out, Your Honor, that certainly they have not. What does one-handedness mean? In particular, what does it mean for, and the one-handedness language, Your Honor correctly pointed out, is directed in particular to the second magnetic member on the projection from the auxiliary frame over the primary frame. It's that second magnet member that is for allowing one-handed assembly. What is one-handed assembly? How would the person of ordinary skill in the art know if a particular structure is capable of one-handed assembly? If you put it on 99 times out of 100, but the 100th time you poke yourself in the eye with it, is it capable of one-handed assembly? Well, when you look at some of the other prior art, clearly it required more than one hand. So did it, Your Honor. Yeah, you have to open it and place it and hook it on. And for eyeglass wearers, I mean, there is this thing about one hand and getting your glasses on correctly with one hand. But more than that, I wanted to take you back to the patent itself on page 76, column 2, at line 50. And this is an addition to what was read a while ago about the patent. There it says, According to the eyeglass device of the present invention, it includes an auxiliary spectacle frame that may be easily secured to the primary. And it goes on saying that with one hand. And then it goes on to describe in that very same paragraph, the magnetic members that are required for attaching. Isn't that sufficient language to tie what would be called intended use to the structure of the invention? A couple of things, Your Honor. First, the O5-4 patent is not limited to what's described here, which is the one magnet being... Sorry, my eyes are gone. One of the pair of magnet members, a magnet for attaching the spectacle frames together. No, Your Honor. First of all, we don't see that as being sufficiently structural. It doesn't really add anything to what the claim already says, which is that it's that second magnet member. It ties back the one-handed limitation, what's claimed to be a one-handed limitation, back to the structure and the very essence of the invention of having the magnet secured in the middle bridge. What else is needed other than that type of language? Your Honor, first of all, again, the one-handed assembly language, we do believe is indefinite. But if the court were to find that it were functional language that was sufficiently definite, first, the district court didn't construe one-handedness, so that would be something this court would have to perhaps do on appeal, which it can, as it did in Myers. But second, if that's all that's required is you have bridge-mounted magnets, then we're right back to the prior art anticipating or at least rendering that invention obvious. The STEMI patent, for example, bridge-mounted magnets, magnets embedded in both the primary and auxiliary frame, also teaching a projection over the bridge, and STEMI specifically talks about the eyewear being usable for things like walking downstairs, or leaving your house. STEMI doesn't use the words one-handed, but I'm not sure how else you can really construe that. If you're walking out your front door and putting your glasses on, that at least strongly suggests to the point of making obvious the point that you're assembling STEMI eyewear one-handed. The common-sense argument that AFSEC makes, Your Honor, and I think AFSEC's arguments can really be broken down into having one or both of two fatal defects. First, AFSEC has several arguments that are really trying to draw this court back from the flexible obviousness inquiry of KSR that this court has expanded on in cases like Perkins Webb. And it's trying to draw the court back to the overly rigid, overly structural, overly technical types of analysis that KSR says is not appropriate and that this court has moved away from. So, for example, the argument regarding common sense and what constitutes common sense. The district court did support its findings of common sense here with citations to the prior art. And, in fact, the evidence of record of the prior art itself demonstrates that the person of ordinary skill in the art at the time of the claimed invention did have ample basis for, as a matter of common sense, putting magnets in eyewear the way that's claimed here. So, for example, people of ordinary skill in the art knew the limited number of places where you could put magnets on an eyewear frame. They knew the two ways that you can attach the magnets. You either embed them in the frame or you don't. And they knew that it was desirable to have frames be easily assembled, presumably with one hand. And the district court considered the prior art, considered those teachings and said, in light of all this, and in light of the ease of just moving magnets around, the claimed invention is merely an obvious design choice. So his common sense assessment, which he did support by reference to our expert, who engaged in a similar common sense analysis, is not something that's being done in hindsight without reference to evidence of record at the time the invention was made. It's grounded in what the person of ordinary skill in the art knew as demonstrated by the prior art. I mentioned to Mr. Nicodema that in view of the fact that there were so many teachings of so many references, wouldn't the placement of this magnet in the middle bridge portion be simply a matter of ordinary design choice of no real patentable consequence? And he brought up the fact that, well, the problem with that is that it runs right into hindsight. And that would beget an analysis in every obviousness case filled with hindsight because you have the laundry list of references and then you just, knowing the solution, you just sort of pick and choose and say, well, that would have been just a choice. But the question I have is really whether KSR and all of our cases that talk about common sense can be read to allow that kind of after-the-fact cherry-picking of things. And isn't that the problem with Judge Young's analysis here? I think not, Your Honor, because although this is a crowded field and there are a number of different design iterations out there, when you look at the problems to be solved and the types of solutions available, it really distills down to very few. If you want to make attachable eyewear with magnets, which was known, where can you put the magnets? You can put them on the frame. You can put them at the temples. You can put them on the lenses. You can put them on the bridge. There's no place else to put them. This is not a case where we have limitless options available and we're cherry-picking from among a wide range of solutions. There's a limited number of places to put magnets and there's only two ways to attach them. So you do see in the art different variations in that, but they are design choices and they show people of ordinary skill in the art balancing the aesthetics of where the magnets are versus the functionality of ease of removal. And this patent doesn't claim, again, anything other than one basic structural design element. Nothing unexpected about the results. Nothing new in the combination or in the specific elements that were out there. Again, at the time of this invention, there already was bridge-mounted magnetic eyewear. There was bridge-mounted magnetic eyewear with a projection going over the primary frame bridge. So in order to find this patent obvious, we're not cherry-picking from a thousand different teachings. In fact, as we've argued, you can find it obvious in view of perhaps even just Mieke or Stemme alone. Certainly Mieke and Stemme in combination. That's two references. We're not cherry-picking from thousands of options. So there may be a case where this Court has to decide that issue, but I would suggest it's not that case. Okay, great. Thank you very much. Mr. Nicodemus? Yes, Your Honor. Thank you. You get the final word. Yes, sir. I'll start with common sense. And I'd like to, because I think here what both counsel and Judge Young did is the essence of hindsight reconstruction. Here's what this Court said in the Mintz case, only in May. Simply because the technology can be easily understood does not mean that it will satisfy the legal standard of obviousness. In fact, objective consideration of simple technology is often the most difficult because once the problem and solution appear together in the patent disclosure, the advance seems self-evident. Instead, the proper analysis requires a form of amnesia that forgets the invention and analyzes the prior art and understanding of the problem at the date of the invention. And only two experts in this case did that. The three examiners at the patent office during the re-examination and Mr. Zarrow. And if I heard counsel correctly, she said that the District Court's opinion was grounded in the testimony of their expert, Sedana. Well, let's see. The Court definitely recognized they needed experts based on the concepts and optics case. And here's the Mikey and Stemme references that Altair relies on principally. Listen to what the Court said at A31. Sedana's comparisons of the Mikey and Stemme patents with Claim 1 of the 054 patent are ambiguous on the actual scope of both of these patents. Sedana's charts simply repeat Claim 1 when describing both the Mikey and Stemme patents, making it very difficult for this Court to understand the limitations of the prior art in comparison to Claim 1. And look what he says in footnote 6. This Court takes its gatekeeper role very seriously. As Altair bears the burden of proof on the issue of invalidity, if its experts' reports and deposition do not meet the Federal Circuit standards under Kyoto imposed, they must be ignored and its claim of invalidity based on obviousness must fail. Well, Judge Young went on for pages discrediting Mr. Sedana. Yet he said, but I'm going to rely on his internal logic, meaning his conclusion. So, all the Judge did was use his own internal 15 years after the fact notions of common sense, which this Court, it meant, says you cannot do. Supposing the Judge was wrong about footnote 6? I'm sorry? Supposing the Judge was wrong about footnote 6, that the District Court did not necessarily have to rely on an expert? Suppose he was wrong? You still have to ask yourself the question. Back in 1996, when this patent application was filed, common sense still has to mean common sense of the skilled artisan. And the evidence in this case is 3 to 5 years of design and development experience in our work. Would that skilled artisan at that time have looked at all the prior art, with all the hooks and prongs and all these other things and divergent teachings, and come up with the solution of the 054? The answer is no. And the answer is no evidence of that. And even if you disregarded the experts, you can't disregard the PTO and the re-examination, Your Honor. Those were the experts. Voltaire went to them for their expert analysis. Well, we're not bound by the Patent Office's determination, are we? No, you're not, you're not, Your Honor. But I believe it's a persuasive piece of evidence because the standard is clear and convincing evidence. A couple of other points I'd like to make. Very briefly, because you have consumed your time. One final comment. One final comment. The one-handed limitation, there is sufficient structure in the specifications. The judge never ruled on any indefiniteness argument. It can't be raised for the first time and adjudicated on appeal when the judge, this court reviews judgments, not counsel of arguments. The Stencil case they cited was never in their briefs. It's clear from this patent that the one-handed limitation is an important feature of this invention. Thank you, Your Honor. All right. Thank both counsel. The case is submitted.